[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 9, 2012
JOHN LEY
CLERK

No. 09-12312
_____

D. C. Docket No. 05-01466-GAP-KRS

SCOTT MANSFIELD,

Petitioner-Appellee,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL OF THE STATE OF FLORIDA,

Respondents-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 9, 2012)

Before EDMONDSON, MARCUS and PRYOR, Circuit Judges.

MARCUS, Circuit Judge:

In this capital case, the State of Florida appeals the district court's order granting habeas relief to petitioner Scott Mansfield on his claim that the admission at trial of a videotape of his custodial interrogation by law enforcement officers, when he never received any Miranda warnings, yielded prejudicial constitutional error. On direct appeal, the Florida Supreme Court determined that the admission of the videotaped interrogation was error, but concluded that the error was harmless beyond a reasonable doubt. The district court disagreed, determining that the Florida Supreme Court's harmless error determination was an objectively unreasonable application of clearly established federal law and that the admission of the videotape had a substantial and injurious effect on the jury's verdict.

After thorough review of the record, and having had the benefit of oral argument, we reverse the judgment of the district court. As we see it, the district court essentially engaged in its own factfinding process, failing to accept as correct (as it was obliged to do) some of the unrebutted factual findings of the Florida Supreme Court that credited significant pieces of the State's case against Mansfield. The district court also afforded precious little weight to other pieces of evidence that the Florida Supreme Court fairly relied upon, and ignored entirely still other evidence incriminating Mansfield. Viewing the entirety of the evidence in light of the full record and according proper deference to the Florida Supreme

Court's factfinding process, we are constrained to conclude that the admission of the videotaped interrogation amounted to harmless error under the "actual prejudice" standard for collateral review set forth by the Supreme Court in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Accordingly, we reverse the district court's order granting habeas relief.

## I.

Mansfield was convicted of the first degree murder of Sara Robles. The underlying facts, which we glean from the trial testimony and the opinion of the Florida Supreme Court addressing Mansfield's direct appeal of his conviction and sentence, Mansfield v. State, 758 So. 2d 636 (Fla. 2000) ("Mansfield I"), are these.

On October 15, 1995, at approximately 3:00 a.m., Sara Robles was brutally murdered. Her body was discovered later that morning, lying adjacent to a Winn-Dixie grocery store in Kissimmee, Florida. Her breasts and pelvic area had been mutilated, and further examination revealed that her nipples had been cut off, as well as portions of her labia minora, labia majora, and clitoris. Robles was found wearing a watch that was cracked and stopped at 3:00 a.m. Food stamps were strewn around her body, and a pager was found less than eight feet away. The police also found two gold chains: one by the pager, and the other on Robles' body.

3

The police investigation that followed determined that Robles and a male matching Mansfield's description had been at a nearby bar called Rosie's Pub, located in the same shopping plaza as the Winn-Dixie, in the early morning hours on the day of the murder. The police interviewed a bartender at Rosie's Pub, who indicated that Robles, Mansfield, and a third individual, William Finneran, left the bar shortly after 2:00 a.m. The police also interviewed Finneran, who testified at trial that he left the bar at the same time as Mansfield and Robles and that he last saw the two just outside the Winn-Dixie before they entered the store.

The police discovered that the pager found at the crime scene belonged to Mansfield. Detectives from the Kissimmee Police Department went to Mansfield's residence on the evening of October 15 to question him. Mansfield agreed to be interviewed by the detectives at the police station. The interrogation was videotaped by the police.

The videotaped interrogation, which was played to the jury at trial over Mansfield's objection, is at the core of this appeal. The interrogation took place on the night of October 15, 1995, the date of the murder. Once at the police station, Mansfield was interrogated by a total of three officers. It is undisputed that the officers never informed Mansfield of his Miranda rights prior to or during the interrogation. Mansfield I, 758 So. 2d at 644.

4

The vast majority of the approximately two-hour-long interrogation consisted of the officers asking Mansfield about where he went -- and with whom -- after leaving Rosie's Pub on the morning of the murder. Mansfield initially said that he went directly home by himself, but later, after being confronted with evidence placing him at the Winn-Dixie with the victim shortly before her death, repeatedly claimed that he was drunk at the time and could not remember what had happened or where he had gone. Mansfield gave similar denials when confronted with other evidence. When the officers told Mansfield that they had found his pager (because it had been discovered near Robles' body next to the Winn-Dixie), Mansfield claimed that he must have lost it at the bar or it must have been stolen.

The interrogation also contained a number of exchanges in which the officers accused Mansfield of committing this gruesome murder. The interrogation did not contain a confession, however. Throughout the interrogation, Mansfield consistently denied the officers' accusations.

During the course of the interrogation, the police received further evidence placing Mansfield at the scene of the crime. Juanita Roberson, who was working at the Winn-Dixie on the morning of the murder, identified Mansfield in a photo lineup. In particular, she identified him as the man she twice saw with Robles in

5

the early morning hours of October 15 -- first inside the Winn-Dixie, and then outside of the store at approximately 3:00 a.m.

At the close of the interrogation, the police arrested Mansfield and took into evidence a ring with a "grim reaper" design that Mansfield was wearing. The next day, Mansfield's brother Charles called the police and alerted them to items found in Mansfield's room, which included food stamps, a knife, clothing, and a towel.

At trial, the State's medical examiner, Dr. Julie Martin, testified that Robles died of asphyxia due to airway compression as a result of blunt force trauma to the neck. Dr. Martin opined that the murderer likely strangled Robles with one hand, while using the other hand or an object, such as Mansfield's ring, to press down on her lower neck, causing the trachea to collapse. Dr. Martin concluded that Robles was alive but likely unconscious when parts of her genitalia were excised by a sharp object.

The jury found Mansfield guilty of first-degree murder. Mansfield I, 758 So. 2d at 642. Following the penalty phase, the jury unanimously recommended the death penalty. Id. The trial court followed the recommendation and sentenced Mansfield to death. Id. In support of the death sentence, the trial judge found two aggravating circumstances. First, the crime was especially heinous, atrocious, or cruel, and second, the crime occurred during the commission of, or an attempt to

commit, a sexual battery.  Id.  The trial court found no statutory mitigators and five

nonstatutory mitigators.  Id.  The trial court afforded very little weight to the

following three mitigators: (1) the defendant displayed good conduct during trial;

(2) the defendant is an alcoholic; and (3) the defendant's mother was an alcoholic

during his childhood.  Id.  However, the court afforded some weight to the other

two mitigators: (1) the defendant had a poor upbringing and dysfunctional family;

and (2) the defendant suffers from a brain injury due to head trauma and

alcoholism.  Id.

Mansfield filed a direct appeal of his conviction and death sentence, and the

Florida Supreme Court affirmed the murder conviction and death sentence in an

opinion issued on March 30, 2000.  Mansfield I, 758 So. 2d 636.  After describing

the videotaped interrogation, the Florida Supreme Court concluded that the

interrogation was erroneously admitted and should have been suppressed.  Id. at

644-45.  The Florida Supreme Court noted that it was "undisputed that Mansfield

was not advised of his [Miranda] rights at any point prior to or during the

interrogation," and that Mansfield would not have felt free to leave during the

interrogation.  Id.  Accordingly, Mansfield was "in custody for purposes of

Miranda."  Id.

The Florida Supreme Court then concluded that the admission of the

7

interrogation was harmless beyond a reasonable doubt:

> "The erroneous admission of statements obtained in violation of
> <u>Miranda</u> rights is subject to harmless error analysis." <u>Caso v. State</u>,
> 524 So. 2d 422, 425 (Fla. 1988). Error is harmless if the reviewing
> court can say beyond a reasonable doubt that the error did not affect
> the verdict. <u>See</u> <u>State v. DiGuilio</u>, 491 So. 2d 1129, 1139 (Fla. 1986).
> Such is the character of the error that occurred in the instant case.
>
> . . . In the instant case the State, in addition to the significant
> circumstantial evidence placing the defendant at the crime scene with
> the victim near the time the murder is presumed to have occurred,
> presented the testimony of [Christopher Randall a/k/a] Michael Johns,
> who recounted a jailhouse confession by Mansfield. Additionally, the
> testimony tended to show that the food stamps found in Mansfield's
> room the day after the murder belonged to Robles. Further, the State's
> medical examiner testified as to the existence of a pattern injury on
> Robles' neck matching the distinctive pattern found on the ring
> recovered from Mansfield during his arrest.

<u>Mansfield I</u>, 758 So. 2d at 644-45.

Mansfield filed a petition for writ of certiorari with the United States Supreme Court, which was denied. <u>Mansfield v. Florida</u>, 532 U.S. 998 (2001). Mansfield then sought postconviction relief in state court. The postconviction trial court conducted an evidentiary hearing and then denied all relief. <u>State v. Mansfield</u>, No. CR95-2078 (Fla. 9th Cir. Ct. June 30, 2003). Mansfield appealed to the Florida Supreme Court, which also denied all relief. <u>Mansfield v. State</u>, 911 So. 2d 1160 (Fla. 2005) ("<u>Mansfield II</u>").

8

Soon thereafter, Mansfield filed his federal habeas petition, raising fifteen claims, in the United States District Court for the Middle District of Florida. On February 26, 2009, the district court issued its opinion and order granting Mansfield's petition as to Claim One (the claim that the erroneous admission of the videotaped interrogation in violation of <u>Miranda</u> was not harmless), and denying relief on Mansfield's remaining fourteen claims. <u>Mansfield v. Sec'y, Dep't of Corr.</u>, 601 F. Supp. 2d 1267 (M.D. Fla. 2009).

The State timely appealed the district court's order granting habeas relief on Claim One. There is no dispute at this stage that the admission of the videotaped interrogation was in error. The sole question we face is whether that error was harmless. We hold that it was.

**II.**

Our review of the district court's decision to grant habeas relief is <u>de novo</u>. <u>Fotopoulos v. Sec'y, Dep't of Corr.</u>, 516 F.3d 1229, 1232 (11th Cir. 2008). Mansfield filed his federal habeas petition after the 1996 effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, and AEDPA therefore governs the petition and the scope of our review. <u>Penry v. Johnson</u>, 532 U.S. 782, 792 (2001); <u>Grossman v. McDonough</u>, 466 F.3d 1325, 1335 (11th Cir. 2006). Under AEDPA, when a state court has adjudicated the

9

petitioner's claim on the merits, as it did in this case, a federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

In granting habeas relief, the district court concluded that the Florida Supreme Court's decision was an "unreasonable application" of clearly established federal law under the standard set forth in 28 U.S.C. § 2254(d)(1). Mansfield, 601 F. Supp. 2d at 1308-09. "A state court decision is an 'unreasonable application' of clearly established [federal] law if the state court identifies the correct governing legal rule from the Supreme Court's holdings but unreasonably applies it to the facts of the particular defendant's case." Ferrell v. Hall, 640 F.3d 1199, 1223 (11th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 407 (2000)).

This standard is a highly deferential one. AEDPA "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted). "A state court's determination that the claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter,

131 S. Ct. 770, 786 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed us that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003) (per curiam) ("We may not grant respondent's habeas petition, however, if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the [state appellate court] applied harmless-error review in an 'objectively unreasonable' manner."); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law."). In short, as the Supreme Court recently observed, "[i]f this standard is difficult to meet, that is because it was meant to be." Harrington, 131 S. Ct. at 786.

In Chapman v. California, 386 U.S. 18 (1967), the Supreme Court held that on direct review, a federal constitutional error is harmless only if the reviewing court is "able to declare a belief that it was harmless beyond a reasonable doubt,"

11

id. at 24.  Under AEDPA's unreasonable application prong, 28 U.S.C. § 2254(d)(1), federal habeas relief may only be granted if the state court's application of the Chapman harmless error standard on direct review was "objectively unreasonable."  Esparza, 540 U.S. at 18.  For ease of exposition, we refer to this standard as the "AEDPA/Chapman" standard.  See Fry v. Pliler, 551 U.S. 112, 120 (2007).

As a federal habeas court, however, we apply a different harmless error analysis than the one articulated in Chapman.  On collateral review, a federal constitutional error is harmless unless there is "actual prejudice," meaning that the error had a "substantial and injurious effect or influence" on the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  Harmlessness under the Brecht standard is a question of law that we review de novo.  Vining v. Sec'y, Dep't of Corr., 610 F3d 568, 571 (11th Cir. 2010) (per curiam); Prevatte v. French, 547 F.3d 1300, 1305 (11th Cir. 2008).  "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman."  Fry, 551 U.S. at 121-

12

22. Because of the "[s]tates' interest in finality," the states' "sovereignty over criminal matters," and the limitation of habeas relief to those "grievously wronged," the Supreme Court set forth in Brecht a standard that is more favorable to and "less onerous" on the state, and thus less favorable to the defendant, than the Chapman harmless beyond a reasonable doubt standard. Brecht, 507 U.S. at 637; accord Fry, 551 U.S. at 117. The Supreme Court emphasized in Brecht that "collateral review is different from direct review," and, therefore, that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." Brecht, 507 U.S. at 633-34.

Thus, we have at our disposal two different standards for evaluating harmless error: the AEDPA/Chapman standard and the Brecht standard. It is clear that when a state court on direct review has determined that the alleged constitutional error was harmless under Chapman, a habeas petition cannot be successful unless it satisfies both AEDPA/Chapman and Brecht. That is, for a federal court to grant habeas relief, it must be true both that the state court's application of the Chapman harmless beyond a reasonable doubt standard was objectively unreasonable and that the error had a substantial and injurious effect or influence on the verdict. Fry, 551 U.S. at 119 (explaining that a petitioner must continue to satisfy Brecht even after the enactment of AEDPA, because AEDPA

13

"sets forth a precondition to the grant of habeas relief . . . not an entitlement to it"). That said, as the Supreme Court recognized in Fry, "it certainly makes no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former." 551 U.S. at 120.

Similarly, a federal court may deny habeas relief based solely on a determination that the constitutional error is harmless under the Brecht standard. Because the petitioner must satisfy both tests in order to obtain habeas relief, it necessarily follows that relief may be denied on the basis of Brecht alone. Indeed, subsequent to the Supreme Court's decision in Fry, decisions of this Court have denied habeas relief solely under the Brecht standard, without first examining whether the state court's harmless error determination on direct review was objectively unreasonable. See Vining, 610 F.3d at 571-74; Hodges v. Att'y Gen., State of Fla., 506 F.3d 1337, 1343 (11th Cir. 2007). Although, unlike the instant case, it was not entirely clear in those cases whether the state court had conducted its harmless error analysis under the correct Chapman standard, we proceeded to deny habeas relief solely under an application of Brecht without ever engaging in the AEDPA/Chapman analysis. Vining, 610 F.3d at 571-74 & n.2.; Hodges, 506 F.3d at 1343.

We also observe that almost all of our sister circuits have concluded that a

14

determination that an error is harmless under the Brecht standard is sufficient for the denial of habeas relief, without any examination of whether the state court's harmless error determination under Chapman was objectively unreasonable. See Wood v. Ercole, 644 F.3d 83, 93-94 & n.9 (2d Cir. 2011); Bauberger v. Haynes, 632 F.3d 100, 104-05 (4th Cir. 2011); Welch v. Workman, 639 F.3d 980, 993 (10th Cir. 2011); Wesbrook v. Thaler, 585 F.3d 245, 255-56 (5th Cir. 2009); Ruelas v. Wolfenbarger, 580 F.3d 403, 411-13 (6th Cir. 2009); Jackson v. Norris, 573 F.3d 856, 858 (8th Cir. 2009); Foxworth v. St. Amand, 570 F.3d 414, 435-36 (1st Cir. 2009); Moses v. Payne, 555 F.3d 742, 755 (9th Cir. 2009); Bond v. Beard, 539 F.3d 256, 275-76 (3d Cir. 2008). But see Johnson v. Acevedo, 572 F.3d 398, 404 (7th Cir. 2009) (requiring a two-step analysis: first, AEDPA/Chapman, and then, if the petitioner clears the AEDPA/Chapman hurdle, Brecht).

In short, we observe, consistent with the Supreme Court's decision in Fry, that a federal habeas court may deny relief based solely on a determination that a federal constitutional error was harmless under the Brecht standard.

## III.

### A.

On appeal, the State contends that the district court erred in granting Mansfield habeas relief, having wrongfully substituted its own independent

factfinding about the nature and strength of the State's evidence against Mansfield for the judgment of the Florida Supreme Court. In particular, the State says that the district court rejected the state court's factfinding determination by failing to assign sufficient (if any) probative value to: the jailhouse confession testimony of Christopher Randall a/k/a Michael Johns ("Randall"); the incriminating evidence, especially food stamps, found in Mansfield's room at his brother's apartment; the medical examiner's testimony regarding a distinctive pattern injury on Robles' neck that was consistent with Mansfield's "grim reaper" ring; and the significant circumstantial evidence, including Mansfield's pager, placing Mansfield with Robles at the scene of the crime at almost the exact time of Robles' death.

In response, Mansfield primarily challenges the probative value of the State's evidence against him, asserting that the State only had a weak case for conviction without the videotaped interrogation. Mansfield claims that: the testimony of Randall, who was heavily impeached at trial, was not credible in the least; the food stamps found in Mansfield's room were "not incriminating" because the State never proved that they were issued to Robles; the pattern injury on Robles' neck was "not incriminating" because the medical examiner only testified that the grim reaper ring could have caused the injury, not that it definitively caused the injury; Mansfield's pager found near Robles' body had "no evidentiary

16

weight" because "[p]agers fall off of people all of the time"; and the identity of the murderer is uncertain because Finneran had a weak alibi and was also observed near the crime scene around the time of the murder. In short, Mansfield's position is that, absent the videotaped interrogation, the evidence against him had precious little probative value.

Under AEDPA, however, a state court's factual findings are presumed correct, and the petitioner bears the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see also Ferrell, 640 F.3d at 1223. "Clear and convincing evidence entails proof that a claim is 'highly probable,' a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt." Ward v. Hall, 592 F.3d 1144, 1177 (11th Cir. 2010) (quoting United States v. Owens, 854 F.2d 432, 436 n.8 (11th Cir. 1998)). Indeed, we have noted that our review of findings of fact by the state court under § 2254(e)(1) "is even more deferential than under a clearly erroneous standard of review." Wood v. Allen, 542 F.3d 1281, 1285 (11th Cir. 2008) (quoting Stephens v. Hall, 407 F.3d 1195, 1201 (11th Cir. 2005)), aff'd, 130 S. Ct. 841 (2010). "Therefore, where factual findings underlie the state court's legal ruling, our already deferential review [under AEDPA] becomes doubly so." Childers v. Floyd, 642 F.3d 953, 972 (11th Cir. 2011) (en banc).

17

Viewing the evidence through the lens of AEDPA, as we must, the State has the better of the argument. Here, in connection with its harmless error determination, the Florida Supreme Court plainly made factual findings crediting four important pieces of evidence in support of Mansfield's conviction: (1) the testimony of Randall, who recounted a very detailed jailhouse confession by Mansfield; (2) the testimony of the medical examiner that a pattern injury found on the victim's neck "match[ed]" the distinctive pattern found on the ring recovered from Mansfield during his arrest; (3) the evidence tending to show that the food stamps found in Mansfield's room the day after the murder belonged to the victim; and (4) the "significant circumstantial evidence placing the defendant at the crime scene with the victim near the time the murder is presumed to have occurred." Mansfield I, 758 So. 2d at 645. In concluding that the error -- admission of the videotaped interrogation -- was not harmless under either AEDPA/Chapman or Brecht, the district court improperly afforded virtually no deference to the Florida Supreme Court's reliance on the considerable body of evidence mounted against Mansfield.

**1.**

To begin with, the district court erred in completely rejecting the Florida Supreme Court's credibility determination about Randall, who testified at trial that

18

Mansfield had confessed to the murder during a time in which Mansfield and Randall shared a holding cell. Randall testified that Mansfield told him that "he cut the fucking bitch's tits off," and that he cut Robles' vaginal area, but that he wasn't concerned with getting caught because he went swimming in a nearby pool after the murder "so that the chlorine would eat the blood and get the shit out from underneath his fingernails."

The district court considered Randall's testimony highly suspect. The district court pointed out Randall's extensive criminal history and "fantastic record of extracting confessions from his cell mates." 601 F. Supp. 2d at 1290, 1305. The district court also noted that "there was no information in Mansfield's alleged confession that was unknown to the general public by that time." Id. at 1306.

However, the Florida Supreme Court's finding that Randall's testimony was credible was not rebutted by clear and convincing evidence, and the district court was plainly required to presume the correctness of that factual finding under AEDPA. 28 U.S.C. § 2254(e)(1). Both Randall's state felony convictions and his prolific history of extracting confessions were presented to the jury at great length during the defense's cross-examination of Randall. Nonetheless, the jury convicted Mansfield, and the Florida Supreme Court credited Randall's testimony as evidence contributing to Mansfield's conviction. In addition, we can find no

19

record support for the district court's determination that the contents of Randall's testimony were known to the general public at the time of Mansfield's jailhouse confession.

Moreover, Randall's testimony concerning Mansfield's actions after the killing was corroborated by the testimony of Mansfield's niece, Melissa Johnson (who lived in the apartment where Mansfield was staying), who testified that Mansfield arrived at the apartment at approximately 4:30 a.m. on the morning of Robles' murder, that Mansfield did not have his shirt on and was carrying his shoes, that Mansfield's entire body was wet, that Mansfield asked her for a towel, and that Mansfield had a red spot on his shorts. Although ignored entirely by the district court, this testimony corroborated the account reported by Randall at trial: that Mansfield went swimming shortly after committing the murder in order to wash off any blood or other physical evidence.

**2.**

The district court afforded virtually no weight to the testimony of the State's medical examiner, Dr. Martin, notwithstanding the Florida Supreme Court's finding crediting her testimony. In its harmless error analysis, the Florida Supreme Court said that Dr. Martin testified that the pattern injury on Robles' neck "match[ed]" the pattern on Mansfield's grim reaper ring. Mansfield I, 758 So. 2d

20

at 645. This admittedly would overstate the case if we were to interpret "match" to mean a 100 percent certainty that the injury was caused by the ring, but earlier in its opinion the Florida Supreme Court accurately recounted Dr. Martin's testimony as stating that the pattern injury was "consistent" with the pattern found on the ring. Id. at 641.

More importantly, the record strongly supports the Florida Supreme Court's determination that Dr. Martin's testimony was credible. On direct examination by the prosecution, and with the aid of photographic slides, Dr. Martin explained what it meant to observe a "pattern injury" and described some of the specific characteristics of the injury found on Robles' neck:

Q     That is a pattern injury; is that correct?

A     Yes. I think you can appreciate that within this broad area of abrasion on the front of the neck, we are now seeing something which has a pattern to it. It's rather elliptical, has some points here towards this apex. And then also within it, there are some characteristic lines or curves that to a forensic pathologist who deal [sic] with pattern injuries, this is recognized as a pattern of some type of object.

Q     Okay. And what would be necessary to leave a pattern injury such as that for a body to reflect a pattern injury like that?

A     We expect it to have some -- an object that had some curve to it, an elliptical form, pretty symmetrical on the outside; these two

21

elliptical aspects and then maybe something in the center that has some type of unusual characteristics that would create this type of a pattern.

Dr. Martin testified that, at the time she originally observed the injuries, <u>before</u> being presented with Mansfield's grim reaper ring or any other particular object, "I thought perhaps a piece of jewelry, perhaps a ring or maybe a belt buckle might have a similar configuration that may have caused these injuries."

Mansfield seizes on this line of testimony, particularly Dr. Martin's reference to a belt buckle, to argue that the injury was not sufficiently distinctive for the ring to have much, if any, evidentiary weight. But this distorts the actual testimony. While still on direct examination, Dr. Martin testified that she was later shown Mansfield's ring. Dr. Martin testified that "when I saw it, I thought that it could have produced the pattern injury on the neck." The prosecutor then followed up:

> Q    And could you describe what similar characteristics are observable between the ring and that injury?
>
> A    Well, as you recall from the photographs, we had those two areas kind of elliptical in shape and then we have something similar to that here on the ring. And then in the center of the ring, there is a figure which could have produced the internal characteristics that you saw, that injury on the neck.

Furthermore, Dr. Martin, using scale photographs of the pattern injury, actually

held the ring up to the pattern injury photographs in order to make a visual comparison before the jury -- powerful testimony that was completely ignored by the district court. Again, the district court erroneously afforded virtually no significance to the Florida Supreme Court's findings about Mansfield's ring.

**3.**

The Florida Supreme Court also credited the testimony indicating that the food stamps found in Mansfield's room belonged to Robles. Mansfield I, 758 So. 2d at 645. The police found food stamps strewn around Robles' body at the crime scene. Id. at 640. At trial, the State introduced evidence that Robles had received $576 worth of food stamps only five days before she died. The trial evidence also showed that Mansfield was with Robles shortly before the murder inside the Winn-Dixie, where Robles made two purchases using food stamps. In addition, Mansfield's brother, Charles Mansfield (who owned and inhabited the apartment where Mansfield was staying), testified at trial that he found food stamps in Mansfield's room, and that he told police at the time that the food stamps did not belong to anyone in the apartment and that no one in the apartment received food stamps. In short, there was considerable circumstantial evidence tending to corroborate the Florida Supreme Court's finding that the food stamps found in Mansfield's room the day after the murder belonged to Robles.

23

To be sure, the evidence did not establish with certainty that the food stamps found in Mansfield's room belonged to Robles. Charles Mansfield also testified that, although Mansfield did not receive food stamps from the State, he knew that Mansfield had used them in the past. In addition, Mansfield contends that food stamps are fungible, and the State acknowledged at trial that there is no system for matching a given food stamp with the person to whom it had been issued. But the Florida Supreme Court did not find that the food stamps found in Mansfield's room definitely belonged to Robles. Rather, it found that the evidence "tended to show" that they did. This was a reasonable reading of the totality of the evidence on this issue, and the district court's assessment that the Florida Supreme Court "overstate[d] the case" is not borne out by the record. The district court was, in short, bound to afford real deference to this state court finding of fact as well.

**4.**

Finally, the Florida Supreme Court credited "the significant circumstantial evidence" putting Mansfield with the victim at the scene of the crime at the time of the murder. Mansfield I, 758 So. 2d at 645. At trial, the State established that Mansfield was seen with Robles inside the Winn-Dixie a little before 3:00 a.m., while Robles made purchases using food stamps. Juanita Roberson, a cashier at the Winn-Dixie who rang up Robles' purchases, further testified that, when she

24

went outside the store on her break at around 3:00 a.m., she saw Mansfield and Robles standing together next to one of the side walls of the Winn-Dixie.

The State also established at trial that the time of Robles' death was approximately 3:00 a.m. In particular, Detective Warren Shepard testified that, when law enforcement found Robles' body, she was wearing a watch that was "non-functional" and "had been broken." Shepard testified that "[i]t appeared to have been broken during some type of struggle and it was stopped right around 3:00." Dr. Julie Martin, the State's medical examiner, further supported this approximate time of death. She was asked on direct examination whether she had reached an opinion as to the time of death. She replied: "Yes. I believe [Robles] died at approximately 3:00 a.m. on the morning of October 15 . . . 1995." Mansfield contends that Dr. Martin's opinion "simply was not a medical opinion but rather based on the victim's stopped watch," but there is no record support for this claim. In fact, Dr. Martin's testimony about the time of death went unrebutted at trial.

Additional evidence placed Mansfield with Robles at the scene. Notably, the police found Mansfield's pager close to Robles' body. Detective Shepard testified that the pager was found "within eight feet of the body immediately adjacent to the structure of the Winn-Dixie building." Moreover, Shepard said that

25

law enforcement officials found two gold chains at the scene, one in "close proximity" to the pager and the other on Robles' body, further connecting the defendant's pager with the nearby body.

The district court conceded that this evidence -- the pager and the evidence showing that Mansfield was with Robles "just before she died" -- was significant, stating that it was likely "[t]he strongest part of the case against Mansfield." 601 F. Supp. 2d at 1311. But the district court downplayed the weight afforded this evidence by the Florida Supreme Court, noting that William Finneran, who had left the bar with Mansfield and Robles, had a "weak" alibi. Id. According to the district court, "Finneran also was in Robles' company until just a few minutes before her death." Id.

But the unrebutted testimony at trial was that Finneran was last with Mansfield and Robles before they entered the Winn-Dixie. The testimony did show that Finneran was still in the vicinity of the Winn-Dixie, because he made a collect phone call at around 3:15 a.m. from a nearby store. Accordingly, the State acknowledges that Finneran was "in the general vicinity near the time of the murder," but further contends that this "does not negate the substantial evidence incriminating Mansfield rather than Finneran."

The State is correct that Finneran's presence in the general vicinity does not

negate the considerable body of evidence incriminating Mansfield and the testimony showing that Finneran parted ways with Mansfield and Robles before the murder. The district court's diminution of this evidence was not supported by the record. Indeed, the district court ignored entirely evidence linking Mansfield, not Finneran, to the crime scene, failing to even mention the gold chains found at the crime scene, one near <u>Mansfield's</u> pager and the other on the body of the victim only a few feet away.

**B.**

We repeat that we are obliged to accept as correct the factual findings of the Florida Supreme Court, because they have not been rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Having accepted the state court's findings of fact, we turn finally to our <u>de novo</u> determination of whether the admission of the videotaped interrogation at trial "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637 (quoting <u>Kotteakos</u>, 329 U.S. at 776). "To show prejudice under <u>Brecht</u>, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." <u>Mason v. Allen</u>, 605 F.3d 1114, 1123 (11th Cir. 2010) (internal quotation marks and alteration omitted). Although harmless error review is necessarily fact-specific and must be performed on a case-by-case basis, the

27

erroneous admission of evidence is likely to be harmless under the Brecht standard where there is significant corroborating evidence, id. at 1123-24; Grossman, 466 F.3d at 1337-40, or where other evidence of guilt is overwhelming, Prevatte, 547 F.3d at 1305-06; Grossman, 466 F.3d at 1340.

The corpus of evidence against Mansfield was substantial. As we have detailed, the jury was presented with considerable evidence of Mansfield's presence at the crime scene with Robles almost exactly contemporaneous to the killing. An eyewitness saw Mansfield and Robles together at around 3:00 a.m., just before the time of death. Mansfield's pager was found within eight feet of Robles' body, along with one of two gold chains, the other of which was found on Robles' body. The jury heard Randall's testimony that Mansfield had confessed in violent detail to the savage killing and to going swimming after the killing in order to wash off the blood. The testimony of Mansfield's niece similarly suggested that Mansfield went swimming after the murder. The jury was presented with testimony showing that food stamps were found in Mansfield's room in his brother's apartment the day after the murder. The jury heard evidence that Robles had received several hundred dollars' worth of food stamps less than a week before the murder, had food stamps on her in the grocery store just before the murder, and had used the food stamps -- while accompanied by Mansfield -- to make two

28

purchases at the grocery store, and that food stamps were found strewn about Robles' body at the crime scene. Moreover, Mansfield's brother Charles testified that neither Mansfield nor anyone else in the apartment received food stamps. The jury also heard evidence from the State's medical examiner that the distinctive pattern injury on Robles' neck from where her trachea was crushed was consistent with the pattern of Mansfield's grim reaper ring that was recovered following his arrest.

Finally, we emphasize that the videotaped interrogation was <u>not</u> a confession or admission of guilt by Mansfield. <u>Cf.</u> <u>Arizona v. Fulminante</u>, 499 U.S. 279, 296 (1991) ("A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." (internal quotation marks omitted)). When confronted with the officers' accusations, Mansfield repeatedly denied harming or murdering Robles. What the interrogation did show was Mansfield making false and inconsistent exculpatory statements as to his whereabouts after leaving a bar in the early morning hours just before the murder. For example, Mansfield first claimed that he had gone straight home after leaving Rosie's Pub, but then claimed that he was too drunk to remember what had happened and that he might have gone to the Winn-Dixie with Robles after leaving the bar in order to buy a pack of cigarettes.

And, although he claimed to be too drunk to remember what had happened, Mansfield remembered that he went swimming to "sober up a little bit" before entering the apartment. Similarly, Mansfield first claimed that he had rented his pager three or four months earlier, but when confronted with what the officers claimed was a contrary statement from an employee of the pager company, Mansfield claimed that the pager was a "loaner" because his pager "was in the shop."

The principal substantive information revealed by the videotape -- that Mansfield went to Winn-Dixie with Robles after leaving the bar and that his pager was found near Robles' body -- could not have been prejudicial because it was already well-established and fully corroborated by other evidence. See Mason, 605 F.3d at 1124; Grossman, 466 F.3d at 1338, 1340. Thus, if the admission of the video was prejudicial, the source of the prejudice must have come not from any directly inculpatory statement made by Mansfield, but rather from the jury viewing Mansfield give false or inconsistent statements to the detectives. In this respect the circumstances confronted by the Supreme Court in Brecht itself are instructive. In Brecht, the defendant testified at his trial and admitted to the charged shooting but claimed it was an accident. 507 U.S. at 638. The question before the Court was whether the state's improper use of the defendant's post-Miranda silence for

30

impeachment purposes had a substantial and injurious effect on the jury's verdict. Id. As in this case, the erroneous admission in Brecht was of evidence tending to suggest that the defendant lacked credibility and was attempting to falsely exculpate himself. The Supreme Court concluded that the error was harmless. Id. at 639. The Court's conclusion was based in part on the fact that "the State's evidence of guilt was, if not overwhelming, certainly weighty" and that "other circumstantial evidence . . . also pointed to petitioner's guilt." Id.

So too here. The other, properly admitted evidence against Mansfield was substantial and far more probative than the erroneously admitted interrogation. Given the entirety of the State's evidence against Mansfield and the Florida Supreme Court's factfinding crediting significant pieces of that evidence, we cannot say that the erroneously admitted interrogation -- in which Mansfield consistently denied having committed the murder, and much of the substance of which was corroborated by other independent evidence -- had a substantial and injurious effect on the jury's verdict.

In short, viewing the evidence in light of the record as a whole and accepting as correct the unrebutted factual findings of the Florida Supreme Court, we are compelled to conclude that the erroneous admission at trial of a videotape of Mansfield's interrogation by law enforcement officers was harmless error under

31

Brecht.  Accordingly, we reverse the district court's order and judgment granting

habeas relief on this claim.

**REVERSED.**