[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-11472
_____

D.C. Docket No. 5:08-cv-00557-WTH-GRJ

CHARLES R. HULL,

Petitioner–Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents–Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 15, 2014)

Before PRYOR, Circuit Judge, WOOD,[*] Chief District Judge, EDENFIELD,[**]
District Judge.

PER CURIAM:

_____

[*] Honorable Lisa Godbey Wood, Chief United States District Judge for the Southern
District of Georgia, sitting by designation.

[**] Honorable B. Avant Edenfield, United States District Judge for the Southern District of
Georgia, sitting by designation.

Charles Hull, a Florida state prisoner, appeals the district court's denial of his petition brought pursuant to 28 U.S.C. § 2254. He argues that a *Bruton*[1] error was not harmless and that, therefore, he is entitled to relief. For the following reasons, we disagree and affirm the district court's denial of Charles Hull's petition.

## I. Background

### A

On August 5, 2003, a robbery occurred at a SunTrust Bank in Fruitland Park, Florida. Three men, carrying a black bag and guns, entered the bank at approximately 9:45 a.m. They wore dark clothing that hid their faces, hands, arms, and legs. They claimed to bank staff and customers to have a "bomb," which they placed in a lobby chair and threatened to detonate. The three men took approximately $15,000 and were slipped a dye pack, which they placed in their bag.

As the thieves left, they approached a white 1995 Pontiac Trans Sport with pinstripes. A bank customer saw one thief remove his mask before entering the vehicle. The customer later identified the individual as Fred Rich. After getting in the vehicle, the three men fled west.

---

[1] *Bruton v. United States*, 391 U.S. 123 (1968).

2

Law enforcement responded to the robbery and established a perimeter in the surrounding area. A police sergeant noticed what the offenders had purported to be a bomb. It was actually a taped cardboard box with a digital timing device and wires running into it. It contained no explosives. Instead, it contained black electrical tape and innocuous parts from various household items. The fake bomb also contained a molded piece of concrete, which apparently came from the end of a dumbbell from which the plastic coating had been removed. On the box, investigators found a latent fingerprint from Fred Rich.

Approximately a quarter-mile from the bank, a police officer noticed tire marks that slid sideways into a dirt road and through a mud puddle, indicating that a vehicle had entered the woods. The officer followed the marks and found a van with its doors ajar and engine running. The van was stolen. Also nearby, approximately a half-mile from the bank, a deputy sheriff driving south saw three African-American men run west across the road into woods. The deputy sheriff reported what he saw, and a canine unit quickly responded to track the individuals.

Canines began tracking approximately 900 feet from the van. Law enforcement eventually found Fred Rich running into a log cabin, which was under construction approximately 600 feet into the woods. After taking Rich into

3

custody, the officers continued to track west, but stopped short of an orange grove. They tracked to an apartment complex approximately 600 feet from the van.  Near the apartment complex, the officers found abandoned clothing. The clothing included gloves, ski masks, sweat suits, t-shirts, the bottoms of zip-off pants, and a white rag or cloth attached to a mask. The clothes were grey and stained by red coloring, apparently from a dye pack. As the officers continued west, they found a house under renovation. There, they discovered a partially opened black bag, which contained two guns, a dye pack, and $12,650. Bank tellers later identified some of this cash as coming from the bank.

Soon thereafter, an officer received a report that individuals were seen in an orange grove nearby. The officer and his partner drove through the grove for over an hour, until they found two African-American men lying under a tree, wearing shorts and dark clothing. These men—lying in the middle of a grove, at the scene of a manhunt, and near the bank, abandoned van, and a bag of money and guns—were identified as Willie Hall and the appellant, Charles Hull.

Detectives visited the house of Charles Hull's grandmother, which purportedly also served as his residence. They searched around the yard and found various incriminating items. Electrical wires, black electrical tape, and plastic gloves were found burnt in a burn barrel. An officer believed that these materials were similar to the ones found in the hoax bomb and were in fact connected to the

4

robbery. Moreover, the clock-face of a piece of exercise equipment had been removed and was hanging from wires. Lastly, dumbbells were found. Notably, the plastic weights had been broken open, and the molded concrete had been removed from the plastic coating. A bomb-squad technician found that the concrete inside the hoax bomb fit together "nicely" with the concrete in the mutilated dumbbell.

B

The State charged Charles Hull, Willie Hall, and Fred Rich with six counts: armed robbery, possession or use of a hoax bomb, and four counts of aggravated assault. Charles Hull and Willie Hall were also charged with trespass to the land of another. Charles Hull moved to sever his trial from his codefendants. The trial court denied the motion, and the defendants were tried jointly.

During the trial, the prosecution elicited testimony establishing the facts set forth *supra* Part I.A. In addition, the prosecution presented the testimony of Lavon Quincy Howard, an inmate housed with Willie Hall during their detention at the Lake County Jail. The testimony implicated Charles Hull's rights under the Sixth Amendment's Confrontation Clause and *Bruton v. United States*, 391 U.S. 123 (1968). Specifically, Howard recounted Willie Hall's out-of-court confession, which incidentally incriminated Charles Hull in the robbery. Howard was told that

5

Willie Hall was in jail for trespassing and robbery, that three people were involved in the robbery, that they used a fake bomb as a diversion, and—most importantly—that he and "Dempsy," in reference to Charles Hull, separated from the driver and abandoned their money and guns while fleeing.

During closing arguments, the prosecution summarized Howard's testimony and noted that "Mr. Howard didn't tell [the jury] anything that [it] did not already know from the evidence." The prosecutor specifically noted that ample evidence corroborated that Willie Hall, in fact, committed the robbery. At no time in discussing Howard's testimony did the State mention Charles Hull.

In resolving Charles Hull's motion for a severance and mistrial based on Howard's testimony, the trial court found that the testimony's prejudicial effect would be minimal. Further, it instructed the jury that Howard's testimony was only to be considered against Willie Hall and could not be used to assess the other defendants' guilt.

The jury was initially deadlocked on at least one count. Then, it asked the trial court for clarification on two issues: (1) the "definition of circumstantial evidence compared to physical evidence" and (2) whether it could "convict someone on circumstantial evidence alone." The trial court provided a definition and directed the jury to rely on the court's prior instructions.[2]

---

[2] In full, the trial court answered the jury's questions as follows:

6

The jury found Charles Hull guilty on all charges except for trespassing. The trial court adjudicated Charles Hull guilty in accordance with the verdict and sentenced him to life imprisonment without the possibility of parole. After Charles Hull's conviction, the trial court denied his motion for a new trial based upon the *Bruton* error after concluding that the error "was beyond a reasonable doubt, harmless." The Florida District Court of Appeal summarily affirmed.

## C

Charles Hull filed for state post-conviction relief and raised two ineffective-assistance-of-counsel claims based upon his attorney's failure (A) to file a motion to suppress evidence and (B) to object to the State's summary of Howard's testimony during closing arguments. The trial court denied his motion, and the

---

Circumstantial evidence is legal evidence and a crime or any fact to be proved, may be proved by such evidence. A well-connected chain of circumstances is as conclusive in proving a crime or fact as is positive evidence. Its value is dependent upon its conclusive nature and tendency. Circumstantial evidence is governed by the following rules: No. 1, the circumstances themselves must be proved beyond a reasonable doubt; No. 2, the circumstances must be consistent with guilt and inconsistent with innocence; No. 3, the circumstances must be of a conclusive nature and tendency that you are convinced beyond a reasonable doubt of the defendant's guilt. "The fact to be proven." [sic.]

If the circumstances are susceptible of [sic.] two equally reasonable constructions, one indicating guilt and the other innocence, you must accept the construction indicating innocence.

Circumstances which when standing alone are insufficient to prove or disprove any fact that may be considered by you in weighing direct and positive testimony. [sic.]

Folks, in answer to your second question, I hope this has helped answer the second question, and I will instruct you to rely on the law as I have previously instructed you.

7

Florida District Court of Appeal summarily affirmed. He filed a second state post-conviction motion based on what he purported to be newly discovered evidence. Again, the trial court denied his motion, and the Florida District Court of Appeal affirmed.

On federal collateral review, the district court denied Charles Hull's petition, finding that his confrontation rights were violated by the admission of Willie Hall's confession but that the error was harmless. A certificate of appealability was issued for his *Bruton* claim. Charles Hull now argues that the admission of Willie Hall's confession substantially and injuriously affected or influenced his conviction and was, therefore, not harmless.

## II. Legal Standard

We review *de novo* a district court's denial of a habeas petition. *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005). We also review *de novo* whether a constitutional error is harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012).

## III. Discussion

### A

The Sixth Amendment guarantees criminal defendants the right to confront adverse witnesses. U.S. Const. amend. VI. Thus, in a joint trial, the Confrontation Clause prevents the admission of a codefendant's pretrial confession that

8

implicates another defendant unless the confessor testifies so as to permit cross-examination. *Cruz v. New York*, 481 U.S. 186, 189-90 (1987). The admission of such a confession cannot be cured by an instruction that a jury may only consider the confession against the confessor, and not against any other defendant. *Bruton*, 391 U.S. at 126, 135-37. This is because the lack of cross-examination pertaining to the statements leaves a jury in a position where it cannot "possibly be expected to forget [the statements] in assessing the defendant's guilt." *United States v. Doherty*, 233 F.3d 1275, 1283 (11th Cir. 2000).

If raised on direct appeal, a "*Bruton* violation requires a new trial unless the error was harmless beyond a reasonable doubt." *United States v. Schwartz*, 541 F.3d 1331, 1353 (11th Cir. 2008) (citing *Schneble v. Florida*, 405 U.S. 427, 432 (1972)). "On *collateral* review, a federal constitutional error is harmless unless there is 'actual prejudice,' meaning that the error had a 'substantial and injurious effect or influence' on the jury's verdict." *Mansfield*, 679 F.3d at 1307 (quoting *Brecht*, 507 U.S. at 637). Therefore, "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Id.* (quoting *Brecht*, 507 U.S. at 633-34).

Under the *Brecht* standard, the relevant inquiry is not simply whether the jury was right in its judgment, but "what effect the error had or reasonably may be taken to have had upon the jury's decision" and its impact on the jurors' minds in

the total setting. *Bonner v. Holt*, 26 F.3d 1081, 1083 (11th Cir. 1994) (quoting

*Kotteakos v. United States*, 328 U.S. 750, 764 (1946)). A successful petition

requires more than a reasonable possibility that the error contributed to the

judgment. *Mason v. Allen*, 605 F.3d 1114, 1123 (11th Cir. 2010) (per curiam).

When analyzing the effect of a Confrontation Clause violation, we consider: (1) the

importance of the testimony to the prosecution's case; (2) whether the testimony

was cumulative; (3) the overall strength of the prosecution's case; (4) the

frequency of the error; and (5) the presence or absence of evidence corroborating

or contradicting the testimony on material points. *Id.* at 1123-24; *Cargill v. Turpin*,

120 F.3d 1366, 1375-76 (11th Cir. 1997). Errors are harmless if there is significant

corroborating evidence or the state's evidence of guilt is overwhelming. *Guzman v.*

*Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1355 (11th Cir. 2011). Conversely, errors are

harmful if there are "significant weaknesses" in the case against the defendant. *Id.*

at 1355-56. For example, a case has significant weaknesses if it "boils down" to a

credibility contest. *Id.* A court is compelled to rule in a petitioner's favor if there is

a "'grave doubt' about the harmlessness of the error based upon the record." *Id.* at

1356.

B

The appellant has failed to show a substantial and injurious effect or

influence on the jury's verdict. Despite the *Bruton* error, the content of Howard's

10

testimony was entirely cumulative of and corroborated by what can be inferred readily from other untainted evidence.

The primary indicator that the *Bruton* error was not harmless, according to Charles Hull, is that the jury was deadlocked. Indeed, the jury was deadlocked during its deliberation, but there is no indication that this concerned any offense for which Charles Hull was convicted, or for anything but the trespass offense for which he was acquitted. Tellingly, the trial court declared a mistrial on the trespass offense because the jury *remained* deadlocked on it. Therefore, the fact that the jury was deadlocked deserves little weight here.

Charles Hull also attacks the prosecution's closing argument as reemphasizing the prejudice from the *Bruton* testimony. However, the prosecution handled the *Bruton* testimony with a brief and light touch, mentioning it only in regard to Willie Hall's guilt and noting that it was only meant to corroborate the already existing evidence that implicated him.

The circumstantial evidence, standing alone, inculpates Charles Hull in every phase of the crime: from the robbery's preparation, to its execution, and to the manhunt's end. *See supra* Part I.A. Charles Hull does not dispute the authenticity of several pieces of material evidence; he merely suggests alternative inferences to draw from them. For example, although he admits that he was found

11

lying in an orange grove near the incriminating black bag, he implausibly suggests a break from a "jogging" excursion to explain his presence.

Despite the appellant's attempted characterizations, the evidence of his guilt was strong. The government did not base its case solely on Charles Hull's presence at the crime scene or Howard's testimony. *See United States v. Ramirez-Perez*, 166 F.3d 1106, 1111 (11th Cir. 1999) (vacating convictions on direct review because there was minimal incriminating evidence other than the defendant's presence at the crime scene and *Bruton*-infected testimony); *United States v. Gonzalez*, 183 F.3d 1315, 1323 (11th Cir. 1999) (finding *Bruton* error harmless where there was substantial evidence of a defendant's full participation in a drug conspiracy). Even when scrubbed of the *Bruton* error, the case against Charles Hull was overwhelming. Howard's testimony was cumulative, corroborated, sporadically referenced, and unimportant relative to the rest of the prosecution's evidence. Therefore, the *Bruton* error did not have a substantial and injurious effect or influence on the jury's verdict. The error was harmless.

## IV. Conclusion

We **AFFIRM** the denial of Charles Hull's petition for a writ of habeas corpus.