[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 11-14148

————————————————

D.C. Docket No. 8:07-cv-01275-SDM-AEP

DANIEL BURNS,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

(July 8, 2013)

Before CARNES, HULL, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In this capital case, Daniel Burns appeals the district court's denial of his

petition for a writ of habeas corpus. At the sentencing phase of his state court trial,

Burns asked that the jury be instructed to draw no inference from his failure to testify. But the trial court refused to do so. On direct appeal, while the Florida Supreme Court concluded that the refusal violated Burns's Fifth Amendment privilege against self-incrimination, it also determined that any error was harmless. Burns collaterally attacked the Florida Supreme Court's harmless-error conclusion in federal court, again without success, and now appeals from that judgment.

After thorough review, we affirm. The Florida Supreme Court's determination is neither contrary to nor an unreasonable application of clearly established federal law. In fact, the Supreme Court has never held that the error Burns cites is immune from harmless-error review. Nor can we find that the failure to give a no-adverse-inference instruction had a substantial and injurious effect on the jury's recommendation.

I.

A.

The basic facts are these. In 1987, Daniel Burns and Samuel Williams traveled up Interstate 75, heading to Detroit from Fort Myers, Florida, when Jeff Young, a Florida Highway Patrol Trooper, pulled their car over. Burns v. State (Burns I), 609 So. 2d 600, 602 (Fla. 1992) (per curiam). Young asked Burns and Williams for identification, returned to his police car, and asked the radio dispatcher to check the identifications and the car's registration. Burns v. State

2

(Burns II), 699 So. 2d 646, 647-48 (Fla. 1997) (per curiam). Young then asked Burns if he could check the car's trunk; Burns consented. Burns v. State (Burns III), 944 So. 2d 234, 237 (Fla. 2006) (per curiam).

Burns, as it turned out, was trafficking crack cocaine worth $10,000, some of which he hid in a bank bag in the car's trunk. Burns I, 609 So. 2d at 602. Young found the cocaine and walked to his police car to report his discovery. Burns, however, rushed Young. A struggle ensued. Being far heavier than Trooper Young, Burns grabbed Young, wrestled him to the ground, and enveloped Young with his body. As Young sought to escape, Burns put him in a reverse bear hug, picked him off the ground, and flung him around. The two men struggled and eventually fell into a ditch by the side of the road. Burns choked and repeatedly punched Young. Burns then clawed Young's gun off its holster. Burns v. Dep't of Corr. (Burns IV), No. 07-cv-1275, 2011 WL 3563102, at *2 (M.D. Fla. Aug. 10, 2011). Bystanders gathered around the fight and almost intervened on Young's behalf, but Young instructed them to stay back because Burns had his firearm. Burns I, 609 So. 2d at 602. Burns stood in front of Young with the gun aimed directly at the Trooper. On his knees, Young put his hands in front of his face to shield himself and told Burns that he did not have to do this, that Burns could just walk away. Id. at 602-03. Burns did not walk away. He fatally shot Young in the head. Burns then instructed Williams to drive off and hide the drugs. Williams sped off, and Burns "walked

3

casually" into a nearby marshy area. Despite Burns's attempt to hide in the marshes, the police found and arrested him later that day. Burns IV, 2011 WL 3563102, at *2.

B.

On May 3, 1998, Burns's trial began. The jury found Burns guilty of first-degree murder and drug trafficking. Burns I, 609 So. 2d at 603. The state sought the death penalty, and, by a vote of ten to two, the jury recommended a sentence of death. The trial court followed the jury's recommendation and sentenced Burns to death. Id. The court found that one statutory mitigator (a lack of criminal history) and five nonstatutory mitigators applied to Burns, but the nonstatutory mitigators deserved little weight. Id. at 603 & nn.3-4. It also found two compelling statutory aggravators -- that Burns murdered to avoid arrest and that the murder was heinous, atrocious, and cruel. Burns appealed this decision to the Florida Supreme Court.

Florida's high court unanimously affirmed the conviction but found error in the sentencing proceeding. The murder was not heinous, atrocious, or cruel, the Florida Supreme Court reasoned, because the struggle between Burns and Young "was short" and the gunshot wound "caused rapid unconsciousness followed within a few minutes by death." Id. at 606. Since it could not determine what weight the trial court accorded the various aggravators and mitigators, the Florida

4

Supreme Court vacated the sentence and remanded for a new proceeding. Id. at 607.

The second sentencing proceeding began in April 1994. At pre-trial conference, the state asked if it could introduce evidence of Burns's lack of remorse in its case in chief. The sentencing court answered that the state could not, characterizing the effort as "improper." That said, the sentencing court ruled that the state could discuss Burns's remorse in rebuttal if Burns introduced any remorse-related evidence. The state did not mention remorse in its case in chief. Instead, it presented witnesses who described the egregious nature of the murder and Burns's capture by the police. The witnesses included police officers who responded to Young's radio signals for help, bystanders who saw Burns shoot Young, forensic experts who testified about the shooting, and police officers who later arrested the defendant.

Burns presented thirty-five witnesses in his defense. At least four of them -- the defendant's aunt, one of his sisters, one of his brothers, and a family pastor -- testified that Burns evinced genuine remorse for Trooper Young's death. However, none of them remembered Burns describing the facts surrounding the shooting or that he was transporting crack cocaine when the fatal shots were fired. The defendant's aunt specifically recounted that Burns "had receive[d] the Lord," that he was now a different person, that he was sorry for killing Young, and that he

5

knew life was precious in God's sight. But Burns never spoke of his attempt to transport cocaine.

Burns's sister likewise said her brother was unable to understand how the murder happened, was "so sad," and was "extremely sorry for [Young's] family." On cross-examination, however, she conceded Burns never told her about crack cocaine or explained how he killed the Trooper. And like some of the other defense witnesses, the sister explained that Burns considered the murder an "accident." Another sibling, the defendant's brother, explained, when asked about remorse, that Burns was filled with sorrow and the Trooper's death was a "tragedy, mistake, accident." He too conceded that Burns never told him about crack cocaine. The defendant also called a family friend and pastor who visited Burns regularly in prison. He explained that Burns had grown spiritually, he had sorrow in his heart, and the sorrow grew out of the defendant's remorse. But like the others, the pastor recounted that Burns had not confessed to the facts surrounding the murder.

Several witnesses (including his friends and a former girlfriend) testified that Burns had an impoverished childhood, that he regularly sacrificed himself for the good of his family, and that he was a "very nice person." One witness observed that the defendant was depressed, and several others described him as a religious, caring, and spiritual person. None of the defendant's witnesses ever recalled the defendant explaining the circumstances surrounding the shooting and none recalled

6

Burns ever mentioning that he was transporting crack cocaine in his trunk when he was stopped.

Burns never testified at sentencing, and at the charge conference, he requested a no-adverse-inference instruction that the jurors should not draw any negative inference from his failure to testify. Although the law was by then clear that, if a criminal defendant sought a no-adverse-inference instruction at trial, the judge was obliged to give one, the state objected because this was a sentencing proceeding. The sentencing court agreed that the instruction was unnecessary. During closing argument, the state sought to counter Burns's claim that he felt true remorse, underscoring that the defendant had refused to share the basic facts about the murder with his family, his friends, or his pastor. "[O]ne cannot truly show remorse," the state argued, "unless one is honest with oneself, unless one is honest with one's family, unless one is honest with others and telling them what you have truly done."

This time the jury returned a unanimous recommendation of death, and the court followed the jury's recommendation. In its sentencing order, the trial court found three statutory aggravators: Burns murdered Young while Young was engaged in his official duties as a police officer; Burns killed to avoid or prevent lawful arrest; and Burns murdered to disrupt law enforcement. The court merged these aggravators into one. The sentencing court determined that two statutory

mitigators applied: Burns was 42 years old when he murdered Young, and he had no significant history of criminal activity.[1] But the court also observed that Burns was convicted of gambling in 1976, and that Burns had delivered crack a few months before the murder. These facts sapped the strength of the statutory mitigators, the court concluded. Three nonstatutory mitigators were also found. First, Burns was raised in a poor, rural environment. Second, he contributed to his community and society by loving and caring for his family and by serving in the military -- albeit for only one month and seventeen days of active duty service. Finally, Burns showed some remorse and spiritual growth because Burns "consistently said that [Young's] death was an accident," for which he was sorry. Yet, the court found, Burns was not "completely truthful with anyone about the

---

[1] In relevant part, Florida Statutes section 921.141 states,

> Aggravating circumstances shall be limited to the following:
> . . . .
> (e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
> . . . .
> (g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
> . . . .
> (j) The victim of the capital felony was a law enforcement officer engaged in the performance of his or her official duties.

Fla. Stat. § 921.141(5). Section 921.141 also lists statutory mitigators. "Mitigating circumstances shall be the following: (a) The defendant has no significant history of prior criminal activity . . . . (g) The age of the defendant at the time of the crime." Id. § 921.141(6). The sentencing court considered age a mitigating factor because it demonstrated, when coupled with Burns's lack of history of prior criminal activity, that Burns followed the law for many years.

8

details of his crime, not with the police after his capture, or with his family, or even with his visiting prison pastor." These mitigators did not outweigh the powerful aggravators, and, therefore, Burns was again sentenced to die.

C.

Burns appealed the capital sentence to the Florida Supreme Court, claiming among other errors that the sentencing court violated his Fifth Amendment privilege against self-incrimination when it refused to give a no-adverse-inference instruction. Burns II, 699 So. 2d at 647, 651. The Florida Supreme Court agreed that the Fifth Amendment privilege against self-incrimination required giving on request a no-adverse-inference instruction in a capital sentencing proceeding. Id. The Florida Supreme Court relied on Carter v. Kentucky, a Supreme Court opinion from 1981, 450 U.S. 288 (1981), reasoning that "[t]he United States Supreme Court has recognized . . . that a defendant who does not testify may suffer a penalty if 'the jury is left to roam at large with only its untutored instincts to guide it.'" Burns II, 699 So. 2d at 651 (quoting Carter, 450 U.S. at 301). Nevertheless, the Florida Supreme Court thought the error did not warrant automatic reversal, and concluded that the failure to give the instruction was subject to harmless-error review. Id. at 652. Relying on Chapman v. California, 386 U.S. 18 (1967), the court observed that reversal is not required "if the State can show 'beyond a reasonable doubt that the error complained of did not contribute to the [jury's

9

recommendation].'" Burns II, 699 So. 2d at 652 (alteration in original) (quoting State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986)). Florida's high court then found that the state had proven beyond a reasonable doubt any error was harmless, and, therefore, it affirmed Burns's capital sentence.

Burns unsuccessfully petitioned for a writ of certiorari from the Supreme Court. Burns v. Florida, 522 U.S. 1121 (1998). He also sought post-conviction relief from Florida's courts, but this was unsuccessful as well. Burns III, 944 So. 2d at 249. Burns then filed this federal habeas petition, raising seven claims, in the United States District Court for the Middle District of Florida. First, and relevant for our purposes, he argued that the sentencing court violated his constitutional privilege against self-incrimination when it denied his request for a no-adverse-inference instruction. The district court denied Burns's petition too. Burns IV, 2011 WL 3563102, at *1. Burns then sought a certificate of appealability, which we granted only as to Burns's claim that the resentencing court erred by failing to give the no-adverse-inference instruction.

## III.

We review a district court's decision to grant or deny habeas relief de novo. Fotopoulos v. Sec'y, Dep't of Corr., 516 F.3d 1229, 1232 (11th Cir. 2008). This habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, and AEDPA imposes

10

an "exacting standard" of review. Maharaj v. Sec'y, Dep't of Corr., 432 F.3d 1292, 1308 (11th Cir. 2005). Where a state court adjudicates a claim on the merits, a federal court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

"Clearly established Federal law" means the holding, as opposed to the dicta, of a Supreme Court decision as of the time of the relevant state-court decision. Gary v. Hall, 558 F.3d 1229, 1254 (11th Cir. 2009). A state court's decision is "'contrary to' established federal law" if the decision "applies a rule that contradicts the governing law set forth in" Supreme Court opinions. Id. A state court's decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case," or if the state court "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Reese v. Sec'y, Fla. Dep't of Corr., 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting Greene v. Upton, 644 F.3d 1145, 1154 (11th Cir. 2011)).

11

The only claim here is that the Florida Supreme Court erred when it applied Chapman harmless-error review and concluded that any error was harmless beyond a reasonable doubt. Burns argues that the application of a harmless-error standard was contrary to or an unreasonable application of clearly established federal law, but that, even if harmless-error analysis governed the case, it was unreasonably applied. Since neither Burns nor the state disputes the state court's conclusion that Burns's Fifth Amendment right was violated by the failure to give the instruction, and since we need not address the matter to decide this case, we assume for present purposes -- without deciding -- that the Fifth Amendment requires a trial court to give on request a no-adverse-inference instruction at a capital sentencing proceeding, and assume that requirement was clearly established by decisions of the Supreme Court at the time of Burns's sentence proceeding.

## A.

Burns first says that the failure to give a no-adverse-inference instruction is so fundamental, so structural that reversal would be automatic. We are not persuaded.[2] To be sure, when a criminal defendant's constitutional right is violated,

---

[2] The state says that we should not consider this argument at all because Burns waived it by failing to raise it before the district court. Burns did not raise the claim in his initial habeas petition, but did arguably raise it in his reply brief in support of the petition. We need not decide whether Burns adequately raised the claim in the district court, however, because we exercise our discretion to consider the claim in any event. See Ochran v. United States, 117 F.3d 495, 502 (11th Cir. 1997); McCullough v. Singletary, 967 F.2d 530, 532 (11th Cir. 1992). We do so because the claim presents an important federal issue, raises a threshold question crucial to our

12

the violation may require reversal without any inquiry into harmlessness. But not every constitutional violation, indeed only a handful, fit into that category. In Arizona v. Fulminante, 499 U.S. 279 (1991), the Supreme Court explained that there are two basic forms of constitutional errors: structural error, which demands automatic reversal because it so infects the entire trial mechanism that it transcends the criminal process; and trial error, which is more common. Id. at 311. Structural errors include the outright deprivation of counsel, Gideon v. Wainwright, 372 U.S. 335 (1963), the lack of an objective judge presiding over the trial, Tumey v. Ohio, 273 U.S. 510 (1927), or a court's refusal to instruct a jury that, to convict, it must find a criminal defendant guilty beyond a reasonable doubt, Sullivan v. Louisiana, 508 U.S. 275 (1993). Trial error, by contrast, does not taint the entire trial proceeding. This is "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Fulminante, 499 U.S. at 307-08. "[M]ost constitutional errors can be harmless." Id. at 306. And if the trial error is harmless, a conviction or sentence need not be reversed, despite constitutional violation.

Burns claims the instant error is structural, but in 1997 there was no clearly established Supreme Court law that the failure to afford a no-adverse-inference

---

analysis, and most importantly, yields a clear answer. Pope v. Sec'y for Dep't of Corr., 680 F.3d 1271, 1282 (11th Cir. 2012).

13

instruction was structural, as opposed to trial error. Indeed, the Supreme Court has never offered an opinion about the matter, and therefore we cannot say that the Florida Supreme Court's determination was contrary to clearly established law. The Florida Supreme Court relied heavily on Carter. There the Supreme Court, addressing the guilt phase of a criminal trial, held that "a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so." Carter, 450 U.S. at 300. In Carter, the Court declined to rule on whether the failure to give a no-adverse-inference instruction constitutes structural error. See id. at 304 ("[W]e decline to reach the issue, because it was not presented to or considered by the Supreme Court of Kentucky."). The question remained an open one. And, three years later, the Supreme Court repeated that it had "not determined whether Carter error can be harmless." James v. Kentucky, 466 U.S. 341, 351 (1984). Since then, no opinion by the Supreme Court has answered whether Carter error is trial or structural. It takes no great logical leap to conclude that a state court's decision cannot be contrary to clearly established federal law when there is no clearly established Supreme Court precedent. See Dombrowski v. Mingo, 543 F.3d 1270, 1274 (11th Cir. 2008).

Nor was the Florida Supreme Court's decision an unreasonable application of clearly established federal law. "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Renico v. Lett, 130 S. Ct.

14

1855, 1862 (2010) (emphasis omitted). A state court's ruling is an unreasonable application of clearly established federal law if the ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Reese, 675 F.3d at 1286 (quoting Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011)). Nothing suggests that the Florida Supreme Court's decision was unreasonable, given the state of the law in 1997. To the contrary, Carter did not demand that the Florida Supreme Court apply the structural error doctrine. Fulminante itself recognized that most errors will be harmless. 499 U.S. at 306. Although the failure to give a no-adverse-inference instruction may be serious, the conclusion that it does not pervade or infect the entire trial and may be quantitatively assessed from a trial record is not so lacking in justification as to be an unreasonable application of clearly established Supreme Court law. Cf. United States v. Burgess, 175 F.3d 1261, 1266 (11th Cir. 1999) ("[T]he failure of a court upon proper request to deliver a no-adverse-inference instruction would be classified as a classic trial error, able to be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." (quoting Fulminante, 499 U.S. at 309) (internal quotation marks omitted)). Plainly, it is not like a case, say, where a defendant lacks a lawyer or where the judge is

15

biased against the defendant yet nonetheless presides over an entire trial. See Gideon, 372 U.S. 335; Tumey, 273 U.S. 510.

In short, the Florida Supreme Court's conclusion was neither contrary to nor an unreasonable application of clearly established federal law.

B.

In addition to claiming that the trial court's failure to give a no-adverse-inference instruction was structural error, Burns argues in the alternative that the error was not harmless. According to Burns, he was prejudiced by the failure to give the jury instruction because the state repeatedly mentioned his failure to disclose details about the murder to friends and family, and those statements were, in essence, statements about Burns's failure to testify at the resentencing proceeding. We remain unpersuaded.

On direct review, a federal constitutional error is harmless where a reviewing court can "declare a belief that it was harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24. But because this is an AEDPA case in which the Florida Supreme Court applied the Chapman harmless-error standard, we could grant habeas relief only if the Florida Supreme Court applied the Chapman standard unreasonably, see Mitchell v. Esparza, 540 U.S. 12, 18 (2003) (per curiam), a standard widely known as AEDPA/Chapman.

16

Moreover, as a federal habeas court, we apply a different harmless error analysis than the one articulated in Chapman. On collateral review, a federal constitutional error is harmless unless there is "actual prejudice," meaning that the error had a "substantial and injurious effect or influence" on the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). "To show prejudice under Brecht, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." Mansfield v. Sec'y, Dep't of Corr., 679 F.3d 1301, 1313 (11th Cir. 2012). Harmlessness under the Brecht standard is a question of law that we review de novo. Vining v. Sec'y, Dep't of Corr., 610 F.3d 568, 571 (11th Cir. 2010) (per curiam). "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman." Fry v. Pliler, 551 U.S. 112, 121–22 (2007) (citation omitted). The standard set forth in Brecht is more favorable and less onerous on the state, and thus less favorable to the defendant, than the Chapman standard. Brecht, 507 U.S. at 637. Thus, there are two possible harmless-error standards, and "[i]t is clear that when a state court on direct review has determined that the alleged constitutional error was harmless under Chapman,"

17

as the Florida Supreme Court did here, "a habeas petition cannot be successful unless it satisfies both AEDPA/Chapman and Brecht." Mansfield, 679 F.3d at 1307. But we need not apply both standards in every case. "[I]t certainly makes no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former." Fry, 551 U.S. at 120. Accordingly, "relief may be denied on the basis of Brecht alone." Mansfield, 679 F.3d at 1308. Applying the Brecht standard here, we conclude that the failure to give a no-adverse-inference instruction did not have a substantial and injurious effect or influence on the jury's sentence recommendation.

Burns could not have been prejudiced by the failure to give the instruction, because the state never once commented on Burns's failure to testify. We have said that a "prosecutor impermissibly comments on a defendant's right to remain silent where: '(1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. McGarity, 669 F.3d 1218, 1241 (11th Cir. 2012) (quoting United States v. Knowles, 66 F.3d 1146, 1162-63 (11th Cir. 1995)). The comments and questions at issue probed what Burns had told his friends and family members about the murder and drug trafficking long before the sentencing proceeding. The defendant's mitigation witnesses were asked specifically what

18

Burns had said to them and asked whether he had ever mentioned the details of the murder, or how he came to have crack cocaine in his car. The interrogation concerned Burns's interaction with his friends and family not his silence in court. The inquiry did not manifest any intent to comment on the failure to testify. Nor were the state's questions of such character that jurors naturally and necessarily would have taken them as comments about the defendant's failure to testify. "The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so." Knowles, 66 F.3d at 1163 (quoting United States v. Swindall, 971 F.2d 1531, 1552 (11th Cir. 1992)). The state did not so much as hint at Burns's in-court demeanor, his ability to testify about remorse, or his failure to take responsibility in testifying in front of the jury.

In fact, the state's questions about remorse arose only on cross-examination and were offered only in response to Burns's claim that he was remorseful. This matters, because, although Burns could introduce evidence concerning remorse as a nonstatutory mitigator under Florida law, see Ault v. State, 53 So. 3d 175, 193 (Fla. 2010) (per curiam), the state had a legitimate interest in counteracting that evidence once he did so, see Payne v. Tennessee, 501 U.S. 808, 825 (1991). And statements "clearly responsive" to a defendant's argument, like the state's questions and comments here, are generally not considered as "intended in any

19

respect to comment adversely" on the criminal defendant's decision to remain silent. United States v. Thompson, 422 F.3d 1285, 1299 (11th Cir. 2005); see also United States v. Herring, 955 F.2d 703, 709 (11th Cir. 1992) ("The prosecutor's comment [on the defendant's silence] was fairly intended to rebut a defense lawyer's improper objection . . . [and] was not manifestly intended to comment on [the defendant's] right not to testify.").

Moreover, the mitigators here were weak and the aggravators were strong. The claimed error could not have had a substantial and injurious effect or influence on the jury's sentencing recommendation. The failure to give the jury instruction could only have affected one of five mitigators (Burns's remorse); the supposed error could not have affected any of the other mitigators or aggravators. As far as we can tell, remorse had no influence on the conclusion that Burns killed to avoid or prevent his lawful arrest or that Burns murdered to disrupt law enforcement or, finally, that Burns killed Trooper Young while Young was engaged in his official duties as a police officer. Likewise, remorse could not affect the weight of the other mitigators -- that Burns was 42 years old when he murdered Young, that Burns had no significant history of criminal activity, that Burns grew up in a poor, rural environment, and that Burns contributed to his community -- which were already undercut by Burns's gambling conviction and previous dealing with crack.

These mitigators, including remorse, pale in comparison to the merged aggravator. The facts overwhelmingly establish that Burns bought crack cocaine in order to sell it and that, when Young discovered the drugs in Burns's car, Burns did not surrender. Instead, he brutally attacked Young, using his considerable size advantage to clamp, choke, and pummel Young, and to seize Young's weapon. Once on his knees after the battering he sustained, Young begged Burns to walk away. Burns nevertheless aimed the gun at Young's face in front of a few witnesses, all of whom Young ordered to stay away, even though they might have saved him. Rather than disabling Young or fleeing, Burns shot Young through his hands and in the face.

We add that it wasn't only Burns's failure to fully disclose the details of his crime that evinced a lack of remorse. Some of the defendant's witnesses also said Burns described the murder as an accident, a mistake, or a "terrible accident." Since an accident may be an undesirable and fortuitous event that occurs unintentionally, whereas remorse connotes a sense of culpability or acceptance of wrongdoing, Burns's description of the Trooper's death also could be seen as manifesting a lack of remorse. This evidence came from the defendant's witnesses, and only on cross-examination. Reviewing the record as a whole and applying Brecht, we conclude the claimed error did not have a substantial and injurious effect on the jury's capital sentence recommendation.

21

AFFIRMED.