# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | ) | |
|---|---|---|
| | ) | No. 73130-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| EVAN JOHN WILSON, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 12, 2016 |

2016 DEC 12 AM 8:30
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED

TRICKEY, A.C.J. — Evan Wilson appeals his criminal convictions on the ground that the trial court failed to instruct the jury that it could not draw any adverse inferences from his choice not to testify. The State responds that Wilson did not properly request the instruction or object to the court's refusal to give it. We hold that Wilson did request the instruction but did not preserve the issue by objecting to its omission. Still, because the failure to give the requested instruction was a manifest error affecting a constitutional right, Wilson may raise it for the first time on appeal. Because we hold that the error was not harmless beyond a reasonable doubt, we reverse.

## FACTS

Blake Rosenthal knew Evan Wilson through a mutual friend. Rosenthal owned a pistol, a Sig Sauer 1911. He decided to sell the pistol and posted images of it on Facebook, offering to sell it for $1,000. Wilson told Rosenthal he knew someone, Wiley Breon Smith, who would be interested in buying the pistol. Wilson did not tell Rosenthal Smith's name at the time. Smith's offer was $800 plus two

"ziplock bag[s]" of marijuana for the pistol.[1]  Rosenthal agreed to $900 and one bag of marijuana.

Rosenthal's account of the sale was that he and Wilson met with Smith in the parking lot of the Mukilteo ferry terminal on October 6, 2014.  Rosenthal and Wilson were on foot because they had walked on the ferry from Whidbey Island to Mukilteo.  They got into Smith's car to make the sale.  The three agreed to go to Smith's apartment so that Rosenthal could show Smith how to fieldstrip the pistol.

While they were driving, Wilson was examining the pistol.  He loaded the gun and began to wave it around.  When Rosenthal asked him to unload the gun, Wilson asked him, "How does it feel to get robbed with your own gun?"[2]  Smith asked Wilson what he was doing and stopped the car.  Wilson told Rosenthal to give him his cell phone.  Wilson told Smith not to give Rosenthal the money.  Wilson told Rosenthal, "I know who your brothers are.  If you talk to your—if you tell anybody or tell any of your father's military people, you know, I know where your brothers are, and I know, you know, you live in Coupeville next to that sheriff."[3]  Rosenthal got out of the car without the pistol, the money, or his cell phone.

Smith's account of the robbery was similar to Rosenthal's, although he did not mention any threat Wilson had made to Rosenthal.[4]  After the robbery, according to Smith, Smith wanted Wilson to "get away from [him]."[5]  Wilson was

---

[1] Report of Proceedings (RP) (Jan. 27, 2015) at 21.
[2] RP (Jan. 27, 2015) at 32.
[3] RP (Jan. 27, 2015) at 38.
[4] There were a few differences.  For example, Smith said Wilson told him the price had dropped to between $500 and $600.  Smith also testified that no one told him where they were driving when they left the parking lot.
[5] RP (Jan. 27, 2015) at 103.

concerned that people at the ferry terminal would be looking for him, so Smith dropped Wilson off at a friend's house in Everett. Smith posted a picture of himself on Facebook with Rosenthal's pistol.

Later that month, the police arrested Wilson and Smith for the robbery. The police did not recover the pistol when they arrested Wilson and Smith. The State charged Wilson with first degree robbery while armed with a firearm, unlawful possession of a firearm in the second degree, possessing a stolen firearm, and intimidating a witness.

During the trial, both Smith and Rosenthal testified for the State. In exchange for testifying, the State gave Rosenthal immunity for any offenses "involving: possession or delivery of a firearm under circumstances not authorized by law, or the possession, attempted possession, or intent to deliver marijuana under circumstances not authorized by law."[6] Smith, who was prohibited from possessing a firearm, entered a plea of guilty for possession of stolen property, and the State agreed that it would not prosecute him for possessing or attempting to possess Rosenthal's firearm.

The police officer who had arrested Wilson testified that, when asked about the robbery, Wilson said he could not remember it because of drinking too much alcohol and taking drugs. Rosenthal's mother testified that Rosenthal had called her several times on the evening of the robbery from a stranger's phone. He eventually reached her and told her he had been robbed. He described the robbery to her and she told him to call the police.

---

[6] State's Ex. 14.

3

Rosenthal testified that about a week after the robbery, Wilson sent him a message asking, "Why are you talking shit? To kids? Are you a man or a kid? Be a man. I'll meet up."[7] Rosenthal responded, "Be a man. You put a gun to my head. I work for my possessions whereas you have never had a job and resort to robbing, apparently."[8] Wilson never responded.

Wilson's former girlfriend testified that Wilson had never told her anything about the robbery, although she had mentioned to Wilson that Rosenthal had told her about the robbery.

The mutual friend testified that Rosenthal had told him about the robbery and was going to the police. The friend could not remember Wilson's response.

Before trial, Wilson proposed that the trial court instruct the jury that it could not draw any adverse inferences from his decision not to testify, which we will refer to as the "no-adverse-inference instruction."[9] Before Wilson rested, the court mentioned that it would need to discuss its proposed jury instructions with the parties later that day, telling them that it had made a potential packet, and pointing out that an instruction allowing the jury to consider Wilson's criminal history to impeach him would depend on whether Wilson testified. Because Wilson's earlier felony conviction was also evidence for his unlawful possession charge, the court noted it would need to know how the two instructions about Wilson's criminal history would fit together.

The State said it was assuming that Wilson would not testify. The court

---

[7] RP (Jan. 27, 2015) at 55.
[8] RP (Jan. 27, 2015) at 55.
[9] Clerk's Papers (CP) at 153, 172.

4

responded, "Okay. All right. And maybe that is a good assumption. But just thinking ahead, if he does testify, then that's something we will have to talk about more."[10] Later that morning, Wilson's counsel told the court that Wilson would not testify. The court noted it would "remove the two instructions that involve [Wilson] testifying."[11] No one mentioned the no-adverse-inference instruction at either time that morning.

Before recessing for lunch, the court gave both attorneys its proposed packet for them to review. When they reconvened, both parties agreed that they had had an opportunity to review the packet. The court asked if Wilson had "any exceptions to the [c]ourt's declining to give any particular instructions?"[12] Wilson objected to an instruction regarding a firearm enhancement, but did not except to or mention the court's omission of the no-adverse-inference instruction. The court instructed the jury without giving a no-adverse-inference instruction.

The jury found Wilson "not guilty" of intimidating a witness, but convicted Wilson on the other charges. Wilson appeals.

## ANALYSIS

Under both the United States Constitution and the Washington State Constitution, juries may not draw any adverse inferences from a criminal defendant's decision not to testify. Carter v. Kentucky, 450 U.S. 288, 297-98, 101 S. Ct. 1112, 67 L. Ed. 2d 705 (1981) (U.S. CONST. amend. V); State v. Pavelich, 150 Wash. 411, 419, 273 P. 182 (1928), aff'd en banc, 153 Wash. 701, 279 P.

---

[10] RP (Jan. 28, 2015) at 10-11.
[11] RP (Jan. 28, 2015) at 49.
[12] RP (Jan. 28, 2015) at 59.

1107 (1929) (Pavelich I) (WASH. CONST. art. I, § 9). If the defendant requests a no-adverse-inference jury instruction, the trial court must give it. Carter, 450 U.S. at 300; Pavelich I, 150 Wash. at 420.

## Instruction Request

The State argues that there was no error because Wilson did not properly request the no-adverse-inference instruction. Wilson responds that he requested the instruction by including it in his proposed instructions. We agree with Wilson.

The trial court is not required to give a no-adverse-inference instruction unless the defendant requests it. State v. Jeffries, 105 Wn.2d 398, 423, 717 P.2d 722 (1986). Parties may propose jury instructions by serving them on the opposing party, filing a copy with the clerk, and delivering the original and a copy to the judge. CrR 6.15(a).

Here, Wilson submitted a no-adverse-inference instruction with his packet of proposed instructions. Wilson's instruction was the pattern jury instruction for this issue. See 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.31 (4th ed. 2016) (WPIC). Before the trial court instructed the jury, it gave both parties the packet of instructions it intended to use. The court had not included the no-adverse-inference instruction. Wilson did not call the missing instruction to trial court's attention. The trial court did not give the no-adverse-inference instruction.[13]

The State argues that Wilson did not "properly request" the instruction because he failed to take exception to the trial court leaving it out.[14] The State's

---

[13] CP at 121-50.
[14] Br. of Resp't at 9, 13.

argument is not persuasive. Washington already assigns legal significance to a party's failure to object to an instruction: the party does not preserve the error for appeal. CrR 6.15(c); State v. Sublett, 176 Wn.2d 58, 75-76, 292 P.3d 715 (2012).

The State does not cite any authority for a distinction between proposing the instruction and requesting it. Instead, it cites cases where the trial court determined that there was no error because the defendant did not request the instruction. State v. Pavelich, 153 Wash. 379, 380, 279 P. 1102 (1929) (Pavelich II); Jeffries, 105 Wn.2d at 423; State v. Zupan, 155 Wash. 80, 97, 283 P. 671 (1929). Those cases do not apply here.

The State also argues that this court should interpret Wilson's failure to object to the missing instruction as a "tactical decision not to request" it.[15] On this record, we do not conclude that Wilson made that tactical decision. If Wilson had wished to withdraw his proposed instruction, he could have done so.

We conclude that Wilson properly requested the instruction by proposing it.

## Issue Preservation

The State next argues that Wilson did not preserve this issue for appeal because he failed to except to the trial court's omission of the instruction. Wilson argues that he did not need to do anything more to preserve the issue because the trial court had notice of the instruction and had an opportunity to include it. We agree with the State because Wilson did not give the trial court an opportunity to correct the error.

Once the trial court has determined which instructions it intends to give, the

---

[15] Br. of Resp't at 10.

court must afford parties an opportunity to object to its proposed instructions outside the presence of the jury. CrR 6.15(c). To object, a party must specify which instruction it is objecting to and state its reasons for doing so. CrR 6.15(c). "Any objections to the instructions, as well as the grounds for the objections, must be put in the record to preserve review." Sublett, 176 Wn.2d at 75-76. This procedure is necessary to "'apprise the trial judge of the nature and substance of the objection.'" Walker v. State, 121 Wn.2d 214, 217, 848 P.2d 721 (1993) (quoting Crossen v. Skagit County, 100 Wn.2d 355, 358, 669 P.2d 1244 (1983)).

Here, Wilson did not mention the no-adverse-inference instruction when asked if he had any objections to the trial court's instructions. Relying on State v. Gosby, he argues that proposing the instruction was sufficient because the trial court had an opportunity to include the instruction. 85 Wn.2d 758, 763, 539 P.2d 680 (1975). Gosby does not support Wilson's argument.

There, the defendant objected to the instruction at issue, but his reasons were not entirely clear from the record. Gosby, 85 Wn.2d at 762-63. The court held that the objections were sufficient because the defendant had included citations to Washington case law in his proposed instructions and the trial court acknowledged, on the record, that the court understood why the defendant objected. Gosby, 85 Wn.2d at 763.

While Wilson also cited relevant authority with his proposed instructions, his case is distinguishable from Gosby because Wilson did not object at all.[16] Proposing the instruction gave the trial court an opportunity to include it, but Wilson

---

[16] Wilson cited to WPIC 6.31 on his proposed instruction. CP at 172.

never gave the trial court an opportunity to correct its error in omitting it. Accordingly, we conclude that Wilson did not preserve the issue.

RAP 2.5(a)(3)

Wilson argues that he may raise the issue even if he did not preserve it because it is a "manifest error affecting a constitutional right." RAP 2.5(a)(3). We agree.

A party may raise a "manifest error affecting a constitutional right" for the first time on appeal. RAP 2.5(a)(3). This exception applies to the failure to object to a jury instruction. State v. Bailey, 114 Wn.2d 340, 347, 787 P.2d 1378 (1990). To raise an issue under RAP 2.5(a)(3), the party must show that "the error is truly of a constitutional magnitude" and that the error is manifest. State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). To be manifest, the error must result in "actual prejudice" to the defendant. Kalebaugh, 183 Wn.2d at 584 (internal quotation marks omitted) (quoting State v. O'Hara, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)). The court does not require a showing of prejudice for the few errors deemed "structural error." State v. Paumier, 176 Wn.2d 29, 36-37, 288 P.3d 1126 (2012).

As discussed above, no one disputes that refusing to give a properly requested no-adverse-inference instruction is an error of constitutional magnitude. The question remains whether it is a structural error, or, if it is not, whether Wilson can show actual prejudice.

Wilson argues that, under Pavelich I, the failure to give a requested no-adverse-inference instruction is a structural error under Washington's constitution.

9

In the alternative, he argues that the error is structural error under the federal constitution. We hold that it is not structural error under either constitution but that Wilson may raise the issue as a manifest error affecting a constitutional right.

*Structural Error – Washington Constitution*

Relying on Pavelich I, Wilson argues primarily that this error requires automatic reversal under article I, section 9 of the Washington Constitution.[17] We do not read Pavelich I to establish that remedy.

In Pavelich I, the trial court refused to give a defendant's no-adverse-inference instruction. 150 Wash. at 413. The Washington State Supreme Court acknowledged that its earlier decisions, requiring the instruction, relied on a statute that was no longer valid. Pavelich I, 150 Wash. at 419-20. As it discussed the history of this instruction, the court quoted a decision in which it had reversed a case on the same issue:

> "It is insisted by the respondent that this was a mere oversight on the part of the court, and that it should be construed like any other principle of law applicable to criminal law, such as the presumption of innocence, reasonable doubt, and the admissibility of evidence, etc.; but, as we have before said, the prominence which the law gives to this particular instruction removes it from the column which embraces the other general propositions. This court has no right to conclude that this omission of the court was not largely instrumental in the conviction of this defendant. It would be a very natural thing for the jury to take into consideration the silence of the defendant when he was charged with this crime, and to use it most tellingly against him."

---

[17] Wilson argues that Washington law has already settled this question, therefore he does not provide a Gunwall analysis. See State v. Gunwall, 106 Wn.2d 54, 58, 720 P.2d 808 (1986). Unless we have already determined that the Washington Constitution provides greater protection than the United States Constitution in a particular context, litigants must provide a Gunwall analysis if they want the court to consider "whether a parallel constitutional provision affords differing protections." City of Woodinville v. Northshore United Church of Christ, 166 Wn.2d 633, 641, 211 P.3d 406 (2009).

Pavelich I, 150 Wash. at 416 (quoting State v. Myers, 8 Wash. 177, 183-84, 35 P. 580 (1894)). The court ultimately held that, even without the specific protection of the earlier statute, Washington's Constitution required the trial court to give this instruction when requested by the defendant. Pavelich I, 150 Wash. at 417-19. The court reversed without conducting a harmless-error analysis or determining whether the error caused prejudice under the facts of the case. Pavelich I, 150 Wash. at 420-21.

Wilson argues that, because the court did not assess whether the error was harmless in Pavelich I, the court held that the error could never be harmless. We disagree. Very few constitutional errors require automatic reversal. Arizona v. Fulminante, 499 U.S. 279, 306, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991); State v. Banks, 149 Wn.2d 38, 43, 65 P.3d 1198 (2003). There was no explicit holding that this is an error that always requires reversal under article I, section 9 of the Washington Constitution. We decline to read Pavelich I that broadly.

Several features of Pavelich I weigh against Wilson's interpretation. First, the Supreme Court noted that, in addition to refusing the defendant's requested instruction, the trial court had "permitted the prosecuting officer to comment upon the lack of contradictory evidence." Pavelich I, 150 Wash. at 419. Although the State did not "actually and directly allude" to the defendant's failure to testify, the State's arguments would have reduced the likelihood that the error was harmless. Pavelich I, 150 Wash. at 420. Second, the court discussed Myers when it was deciding whether the refusal to give a no-adverse-inference instruction was still error, not when it announced the remedy. Pavelich I, 150 Wash. at 416.

11

Additionally, the basis in <u>Myers</u> for distinguishing this error from errors for which the court would have conducted a harmlessness analysis was statutory and not constitutional. <u>Pavelich I</u>, 150 Wash. at 416 (Rem. Comp. Stat. § 2148). Finally, we know from the court's treatment of the defendant's challenge to the sufficiency of the evidence that, while the court did not discuss the record in detail, it had thoroughly reviewed it. <u>Pavelich I</u>, 150 Wash. at 414.

Therefore, <u>Pavelich I</u> does not require reversal when the trial court fails to give a requested no-adverse-inference instruction. Wilson cites no other authority for his argument that the failure to give a no-adverse-inference instruction is structural error under article I, section 9.

*Structural Error – Federal Constitution*

Wilson argues that, even if this error does not require automatic reversal under <u>Pavelich I</u>, it is structural error under the Fifth Amendment. Constitutional errors are either structural errors, which require automatic reversal, or trial errors, which may be harmless beyond a reasonable doubt. <u>State v. Vreen</u>, 143 Wn.2d 923, 930, 26 P.3d 236 (2001); <u>State v. Watt</u>, 160 Wn.2d 626, 632-33, 160 P.3d 640 (2007). Structural errors "undermine the framework of the trial process itself, their effect cannot be ascertained without resort to speculation, or the question of harmlessness is irrelevant based on the nature of the right involved." <u>Watt</u>, 160 Wn.2d at 632. Because trial errors occur "during the presentation of the case to the jury," the reviewing court can "quantitatively" assess their effect "in the context of other evidence." <u>Fulminante</u>, 499 U.S. at 307-08. There is a presumption that constitutional errors are not structural if "'the defendant had counsel and was tried

by an impartial adjudicator.'" Neder v. United States, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (quoting Rose v. Clark, 478 U.S. 570, 579, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986)).

In State v. Montgomery, the court concluded that erroneous jury instructions do not always require reversal. 163 Wn.2d 577, 600, 183 P.3d 267 (2008). When certain criteria are met, the State may request that the court instruct the jury that it may infer that a missing witness's testimony would have been unfavorable to the defendant. Montgomery, 163 Wn.2d at 597-98. In Montgomery, the trial court erroneously gave the missing witness instruction. 163 Wn.2d at 598-99. The court held that, although this type of improper jury instruction could be harmless beyond a reasonable doubt in some cases, this was not one of them. Montgomery, 163 Wn.2d at 600-01.

The absence of a no-adverse-inference instruction is a trial error. The error occurs during the presentation of the case to the jury. The main impact of the error is that the jury may place some evidentiary value on the defendant's decision not to testify. While it is difficult to judge what inferences a jury may draw from *not* hearing certain testimony, it is essentially the same inquiry as the one the court made in Montgomery. Moreover, it is presumptively not structural error under Neder because it does not impact whether the defendant had counsel or appeared before a neutral judge.

Federal authority supports this analysis. The United States Supreme Court has reserved decision on whether the failure to give a requested no-adverse-inference instruction is structural error. Carter, 450 U.S. at 304; accord James v.

13

Kentucky, 466 U.S. 341, 351, 104 S. Ct. 1830, 80 L. Ed. 2d 346 (1984). But several circuit courts have either explicitly held that a harmless beyond a reasonable doubt analysis is appropriate for this error or implicitly held that by conducting a harmlessness analysis when faced with this error. See, e.g., United States v. Brand, 80 F.3d 560, 567 (1st Cir. 1996); United States v. Whitten, 610 F.3d 168, 200 (2d Cir. 2010); Lewis v. Pinchak, 348 F.3d 355, 358-59 (3d Cir. 2003); Richardson v. Lucas, 741 F.2d 753, 755 (5th Cir. 1984); Finney v. Rothgerber, 751 F.2d 858, 864 (6th Cir. 1985); Hunter v. Clark, 934 F.2d 856, 859-60 (7th Cir. 1991); United States v. Soto, 519 F.3d 927, 930-31 (9th Cir. 2008); Burns v. Sec'y, Florida Dep't of Corr., 720 F.3d 1296, 1303-04 (11th Cir. 2013). It does not appear that any federal circuit court has held that the error is structural under the Fifth Amendment.[18] The weight of this federal authority strongly suggests that a refusal to give a requested no-adverse-inference instruction is not structural error under the Fifth Amendment.

The Supreme Court's decisions on structural error also weigh against finding structural error in this case. The Court has found that many substantial constitutional violations involving jury instructions are not structural error. See, e.g., Carella v. California, 491 U.S. 263, 266, 109 S. Ct. 2419, 105 L. Ed. 2d 218 (1989) (jury instruction containing an erroneous mandatory presumption); Pope v. Illinois, 481 U.S. 497, 501-04, 107 S. Ct. 1918, 95 L. Ed. 2d 439 (1987) (jury

---

[18] But, as Wilson points out, a few other states have held the error requires automatic reversal under their own constitutions or the federal constitution. See Commonwealth v. Lewis, 528 Pa. 440, 453, 598 A.2d 975 (1991) (under the Pennsylvania Constitution); People v. Ramirez, 98 Ill. 2d 439, 449-51, 457 N.E.2d 31 (1983) (under the Fifth Amendment).

instruction misstating an element of the offense). And the Court announced its current "harmless beyond a reasonable doubt" standard itself in a case where the prosecutor inappropriately commented on the defendant's refusal to testify. Chapman v. California, 386 U.S. 18, 24-25, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

In short, we conclude that, under the Fifth Amendment, the failure to give a requested no-adverse-inference instruction is not structural error. Therefore, Wilson may only raise this error if he can satisfy the requirements of RAP 2.5(a)(3).

*Manifest*

Wilson argues that he may raise the issue under RAP 2.5(a)(3) because it is manifest. We agree.

As noted above, a party must show that the error it complains of is manifest in order to raise it under RAP 2.5(a)(3). To be manifest, the error must cause "'actual prejudice.'" Kalebaugh, 183 Wn.2d at 584 (internal quotation marks omitted) (quoting O'Hara, 167 Wn.2d at 99). A party demonstrates actual prejudice by showing "'that the asserted error had practical and identifiable consequences.'" O'Hara, 167 Wn.2d at 99 (internal quotation marks omitted) (quoting State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)). An error is identifiable if the trial court could have corrected the error, given what the court knew at the time. Kalebaugh, 183 Wn.2d at 584. For example, if it is "an obvious error that the trial court would be expected to correct even without an objection." State v. Hood, ___ Wn. App. ___, 382 P.3d 710, 714 (2016).

Here, Wilson proposed the instruction. The trial court acknowledged that it had received and read both parties' packets of proposed instructions. The law on

this issue is clear. The trial court could easily have corrected the error. Therefore, the error is manifest and Wilson can raise it under RAP 2.5(a)(3).

### Harmless Beyond a Reasonable Doubt

Wilson argues that the failure to give a no-adverse-inference instruction requires reversal because the court cannot say it was harmless beyond a reasonable doubt. The State responds that the error is harmless because overwhelming untainted evidence proves Wilson's guilt.

The State's case rested on the testimony of two people, Rosenthal and Smith, and the people who testified about what Rosenthal and Smith had told them. As Wilson points out, both main witnesses had motives to lie. The State gave Rosenthal, who had agreed to accept marijuana as part of his payment for the gun, immunity for his cooperation. Smith, who was initially arrested as Wilson's co-conspirator, also received a deal in exchange for his testimony. The primary corroboration of Smith's and Rosenthal's testimony was that they gave similar accounts of the robbery to several people before trial. But there were also indications that they had initially not been completely truthful with the police and others.[19] There was no physical evidence to corroborate their story. For example, the State did not show that Wilson had Rosenthal's gun.

This is exactly the type of case in which a jury would expect the defendant to explain his side of the story. The jurors may well have decided that Wilson's

---

[19] Smith and Rosenthal testified that they had met the day of the robbery, but witnesses testified that Smith and Rosenthal had met each other before the robbery. Initially, Rosenthal did not tell the police that he had agreed to accept marijuana as partial payment for the gun. Smith claimed, at trial, that the gun in the Facebook picture was not Rosenthal's until the State reminded him he could be prosecuted for perjury.

16

failure to testify meant that he had no explanation to give. Based on the record, it is not possible to say beyond a reasonable doubt that this error was harmless.

The State argues that, because the jury did not convict Wilson on the witness intimidation charge, the lack of a no-adverse-inference instruction must have been harmless error. That argument is not convincing.

We reverse and remand for a new trial.

Trickey, ACJ

WE CONCUR:

Spearman, J.

Becker, J.